### THE MARININ S.

### READ *v.* THE MARININ S.

*(District Court, S. D. New York. July 15, 1886.)*

1. CARRIAGE OF GOODS—DUNNAGE—LICORICE—IRON-ORE DUST.
    Upon the discharge of licorice in bundles brought from Cartagena, Spain, along with other cargo, consisting of fine iron ore, the licorice was found more or less damaged from the dust of the iron ore, which was scattered among the bundles, and adhered to the sticks. *Held,* upon the facts, to have been caused mainly through the licorice becoming damp, and through want of sufficient top covering upon the ore to prevent the dust rising and adhering to the damp bundles, either during the voyage, or while discharging, and from insufficient side dunnage, and that the vessel was liable for this damage.

2. SAME—INSUFFICIENT SURVEY—EVIDENCE—SALE OF DAMAGED GOODS—SEPARATION.
    A sale of 1,510 bundles of licorice as damaged goods, upon proof of examination or survey of only 8 or 10 of the whole number, and the evidence being conflicting as to the number of bundles commercially injured, *held,* survey insufficient to charge vessel for the loss arising on the auction sale, and that libelant's claim was to be limited strictly to the number proved damaged, because, after request, the libelant failed to make the full examination in his power, as to the extent of the damage.

3. COSTS—EXAGGERATED CLAIMS—VESSEL IN CUSTODY.
    The libelant's claim being very greatly in excess of the damage proved, and the vessel thereby kept in custody at much expense, *held,* no costs allowed.

In Admiralty.

*Hyland & Zabriskie*, for libelant.
*Ullo, Ruelsamen & Hubbe*, for claimants.

BROWN, J.   This libel was filed to recover damages for alleged injuries to a quantity of licorice, through contact with iron ore, in course of its transportation from Cartagena, Spain, and its delivery in New York.   The bark was chartered to carry 1,000 tons cargo. The charterer furnished the licorice in question, consigned to the libelant; and also a quantity of iron ore, part of which, in lumps, was stowed forward and aft in the lower hold; and the rest, being a fine spiegel-iron powder, was stowed in the center of the hold.   On top of the ore, fore and aft, was stowed the licorice, consisting of 2,112 bundles.   It was shipped on March 31, 1886, and arrived in New York on May 25th.   The unloading was finished on June 2d. The licorice had been sold to arrive, and 600 bundles were accepted by the purchaser.   The rest of the lot was rejected by him on account of the alleged injury to it by the fine powder of the ore, which, it is alleged, had so penetrated the bundles, and adhered to the licorice sticks, as to make them unmarketable as sound goods.   The licorice rejected, amounting to 1,510 bundles, was stored by the libelant in the warehouse of E. F. Driggs & Co.   On June 9th a survey of the licorice was held, upon notice to the master of the bark, by two surveyors, representing the libelant.   The master was represented by a third surveyor, (Mr. Burdette,) who also joined in the partial examination then made.   It was reported damaged, and was afterwards, on June 29th, sold at auction at 2.87$\frac{1}{2}$ cents per pound; good licorice, in sound condition, being then of the market value of 4$\frac{1}{2}$ cents per pound.   The amended libel claims the difference, amounting to nearly $3,000.

Many witnesses have been examined upon both sides, and much diversity of opinion is expressed by the experts and dealers in licorice as to whether the lot stored was materially damaged or not by the particles of the ore that were found adhering to it.   They differ, also, as regards the number of bundles injuriously affected.   There is equal diversity, and some direct contradiction, as to the dunnage used in the ship to separate the licorice from the ore beneath it.   Numerous witnesses, including the captain, the mate, and the boatswain who superintended the loading and the discharge, as well as the stevedore and his men who discharged the cargo, all testify that the 'ore was everywhere separated from the licorice by dunnage, consisting of wood, matting, and an old sail.   But I think the cross-examination of the stevedore's foreman shows that he regarded the dunnage along the sides of the ship as poor and insufficient.   The ore was higher along the center, fore and aft; and the bundles of licorice followed the ore to the skin of the ship.

Several of the libelant's witnesses, who testified to seeing no dunnage at all, say that they were not looking for dunnage, and did not

have their attention directed to that subject. Their testimony on this point is therefore entitled to less weight. Mr. Leaycraft, the port-warden, says that he did look for dunnage, and saw none next to the skin of the ship; none even on the top of the ore, and between the ore and the licorice. His report, under date of May 27th, the day of the bark's arrival, says: "Surveyed the hatchways, and found them dry, and in good order." "May 29th: Surveyed the cargo on board, and found a large number of bales of licorice root damaged by iron ore, from want of dunnage." The number of bales thus damaged is not stated, and his testimony is no more definite. The clear weight of testimony is that no licorice was stowed directly under the main hatch, nor any ore over the bundles. The appearance of ore on top of the bundles on the side, testified to by Mr. Myer, was probably either the result of the rolling of the ship, or of some of the accidents that happened during the discharge. He and other witnesses testify to seeing bundles dragged from forward, over the bare ore, to the main hatch, to be discharged. But as most of the licorice was above the beams, it is extremely improbable that any considerable number could have been injured in that way; and the claimants' witnesses testify that boards were laid fore and aft, upon which the bundles below the beams were rolled aft.

Upon the whole evidence, I am satisfied that, in general, dunnage was put between the ore and the licorice in the stowage of the cargo; that the powdered ore was in the center of the ship; and that, for the most part, at least, no licorice was stowed above the fine ore. From the mate's evidence, as it stands reported, it would seem that, above the fine ore, in the center, wood and matting were placed across the beams, which were about a foot, or a little more, above the fine ore, without any covering directly upon the powdered ore, and that the feathers and cases were stowed above these beams. If this is correct, upon the removal of the feathers and cases, and the dunnage immediately beneath them, which was the first thing done in discharging, the fine ore beneath the beams would be seen without covering or dunnage; and thus very much of the seeming contradiction in the testimony on the subject of dunnage would be explained.

I attach the less weight to Mr. Leaycraft's evidence as to there being no dunnage beneath the licorice, from the fact that dunnage is more commonly looked for along the sides of the vessel, where the dunnage was probably insufficient; and also from the fact that, although he says he was specially called to survey the cargo of licorice after the discharge of it had commenced, he makes no mention of any dampness or mould, but in his report speaks only of "damage from iron ore through want of dunnage." But Mr. Sheffield, one of the libelant's witnesses, and the man, also, who of all seems to have given the most careful attention to the condition of the bundles, says that some of the bales were damaged by the ore that adhered to

them. "*On the dry bales*," he says, "*it was not noticeable;* but the mouldy or damp bales were coated with it." He says there was no covering over the fine ore beneath the main hatch, where they were discharging; and he observed the bales carefully, because he was selecting 300 good bales, which his principals had purchased, and was separating them from the damaged bales. A careful and fair report of the condition of the licorice should not have omitted the fact that is apparent from Mr. Sheffield's testimony, viz., that some of the bundles were damp and mouldy, and that this was directly connected with the adherence of the powdered ore.

Other evidence in the case shows, also, that during the voyage the forward part of the hold became very much heated and damp, with evident sweating of the cargo, and with consequent dripping, to some extent, from the beams; though efforts were made to obviate this by ventilation through the opened hatches. This agrees with the testimony of Sheffield, above quoted, that some of the bales were damp, soft, and mouldy; and other witnesses testify that some bales were broken during the discharge through the same cause, and were again tied up.

The evidence on the libelant's part as to the extent of the damage alleged,—that is, the number of bales materially affected by the adherence of the particles of ore,—is not satisfactory. I do not refer to this point here, as respects the amount of damages recoverable, but because it has an important bearing on the cause of the damage, and the kind of negligence, if any, attributable to the vessel.

It is certain, from the evidence, that a small sprinkling of this harmless iron dust upon the licorice, not readily perceptible to the naked eye, would not affect its commercial value, or the uses to which such liquorice is usually applied. The number of bales stained perceptibly, to ordinary observation, is left in the greatest uncertainty. Nothing like a thorough examination of the bales was made at any time before the sale; and the purchaser at the sale, one Butler, was not called as a witness, nor was the actual condition of the licorice proved by following it into the hands of the consumer. The two surveyors who made the survey on the part of the libelant on June 9th, with Mr. Burdette on behalf of the claimant, examined only some 8 or 10 bales out of 1,510. These were brought from the pile to the window of the store, and found more or less damaged, it is said; and there the examination stopped. Mr. Burdette stated, and desired of the libelant's agent in New York, that a full examination should be made of all the bundles, in order to ascertain what were damaged and what not. This, he says, was promised, but no such examination was made; and Mr. Mayer, the agent, says the request was declined because such an examination was impracticable. But no such impracticability appears. Three different samples were taken from the pile, and produced in court. All, it was said, were taken promiscuously, and at random. Only the libelant's samples

showed material damage.   The other samples, according to the testimony of several experts and dealers, showed no commercial damage. The surveyors could testify to only a few damaged.   The other witnesses could not specify above 50 or 60.   Mr. Burdette estimated that possibly a hundred might have been affected; and the evident inference from all of Mr. Sheffield's testimony is that comparatively few, viz., those bundles only that had become damp and mouldy, were damaged; and those by the adherence of the ore in consequence of the dampness of the bundles.

Upon this evidence I cannot find that there was general damage from the ore extending to all of the 1,510 bales.   The libelant, having possession of the licorice, had it easily within his power to ascertain by inspection the number of bales actually damaged.   The request of Mr. Burdette, in behalf of the bark, was a reasonable request.   The examination of 8 or 10 bundles out of 1,510 was totally insufficient for condemning the whole number, where the nature of the damage was superficial, like this, and was so variable in different bundles.   To throw a large quantity of goods on the market for sale at auction, as damaged goods, upon such slight examination, at the assumed risk and loss of the vessel, appears to me to be as unreasonable and unjust as it would be ruinous in its results to carriers. Looking to the just protection of the interests of carrying vessels, as well as of consignees, a court of admiralty cannot support any such unreasonable and precipitate action.   The good bundles should have been separated from the bad, and the carrier charged with only the damages to those actually injured, together with the expense of the examination and separation, when that course is practicable, and for the evident interest of all concerned.   The master is entitled to the same protection against unreasonable and indiscriminate sales by the consignee in the port of discharge, on the vessel's account and risk, that is imposed on the master in favor of the owner on a sale by the master in a foreign port.   *Tronson* v. *Dent,* 8 Moore, P. C. 419.

In the case of *The Vaderland,* 18 Fed. Rep. 733, 736–738, I had occasion to comment unfavorably upon a somewhat similar failure of the consignees to obtain and to preserve evidence in their power in regard to the extent of certain alleged damage to coils of wire from crushing; holding that every intendment must, in such cases, be against them, and that no inference of damage should be admitted beyond what was fairly proved.   Applying that rule here, and looking fairly at all the evidence produced on both sides, there is no sufficient evidence to indicate that more than a hundred bales were commercially damaged, and possibly not half that number.   If there had been a general want of necessary dunnage, the loss would not have been so small, and the testimony of the ship's officers to the general sufficiency of the dunnage accords with this view.

The conclusion to which I have therefore come is that there has not been proved any such general damage to the 1,510 bales as al-

leged, nor any such general want of dunnage as alleged, but only insufficient dunnage along the skin of the ship, and, probably, no covering immediately over the fine ore; that the evidence does not indicate above a hundred bales, at most, as damaged by the ore; and that upon these the ore probably adhered through the wet, dampness, or mould that had previously affected them, either because wet along the skin of the ship from want of sufficient side dunnage, or dampened from the heating, sweating, and dripping above mentioned, and that the adhering ore became more or less detached as the bundles dried; that the damage from ore, to such as were thus injured, arose, not from want of general dunnage beneath the licorice where it lay upon the ore in lumps, forward and aft, but from the wetting and dampening of the bundles, and from insufficient covering of the fine ore in the center, and beneath the main hatch, to prevent the oredust rising, either previous to or during the discharge; and that, in consequence of insufficient covering, the dust rose from the ore through the rolling of the ship during the voyage, if there was in fact no covering laid immediately upon the fine ore; or, if there was, that then the ore-dust arose from the work of discharging immediately upon top of the fine ore, and adhered to some of the damp bundles in sufficient quantities to become noticeable, and affect their market value; and that a few which were dropped from the sling, or carelessly rolled along into the fine ore, were much more affected, so as to show the excessive damage that a few of the sticks produced exhibit.

The ship is answerable for this injury. The fine ore should have been kept thoroughly covered, both during the voyage and during the work of discharging on top of it. It is common for licorice to become heated and damp during the voyage, and its tendency to attract dust was apparent. There must be a reference, therefore, to compute the amount of the damages to the bundles actually proved to be injured. Either party will be entitled to use the testimony already given, so far as respects the number of bales damaged, and the degree of injury; and also to introduce any further evidence as to the extent of the damage; and, as the ship is still in custody, the reference, at the option of either party, should proceed from day to day till finished, and be brought on on two days' notice.

As the claim of damaged bales made in the libel is very largely in excess of what has been proved upon the trial, and as the auction sale, made without thorough examination of the cargo, and the subsequent claim to hold the vessel liable for all the alleged loss, seem to me unreasonable and unjustifiable, and practically forced the master to leave the vessel in custody at much expense, no costs should be allowed.